

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DISTRICT

# _7:20-cv- 28 - BO_

| | |
|---|---|
| ANTI-TRANNY POLITICAL ACTION COMMITTEE and NAPIER SANDFORD FULLER | COMPLAINT SEEKING EQUITABLE RELIEF FOR CIVIL RIGHTS VIOLATIONS |
| Plaintiffs, | |
| v. | TRIAL BY COURT DEMANDED ON ALL ISSUES, F.R.C.P. 39(b) |

STATE OF NORTH CAROLINA; COUNTY OF NEW HANOVER; COUNTY OF
ORANGE; MASSACHUSETTS INSTITUTE OF TECHNOLOGY (AKA "THE
CORPORATION"); EDWARD J. MᶜMAHON, RICHARD A. BADDOUR, ROSS
STEVEN BARBEE, CHARLES S. BLACKWOOD, GARY L. BOWEN, JAMES T.
BRYAN, III, SAMANTHA HYATT CABE, LAURIE J. SELTZ-CAMPBELL, JOAQUIN
REBECCA CARCAÑO, JAY JYOTI CHAUDHURI, ALEXA Z. CHEW, LINDA
CHRISTINE CHUPKOWSKI, WANDA COPLEY, CHRIS COURDRIET, JR., BLAKE
MATTHEW COURLANG, TERRY VAN DUYN, JAMES F. ELLIS, CAROL LYNN
FOLT, SUSI H. HAMILTON, REBEKA D. HARDEE, REBECCA W. HOLT, SHARON
HUFFMAN, STEPHEN C. KEADEY, DAVID THOMAS LAMBETH III, KRISTEN
SIMONSEN LEWIS, WILLIAM FITZHUGH MASSENGALE, JEFF MᶜCRACKEN,
MARK W. MERRITT, JEFFREY LARKIN NIEMAN, TONY M. OAKLEY, DAVID
PARKER, TERRI PHOENIX, CHRISTOPHER MICHAEL SGRO, NEERA MAKWANA
SKURKY, JAMES C. STANFORD, JOSHUA STEIN, CATHERINE C. STEVENS, JAMES
R. WOODALL, JR., LISA DE SAXE ZERDEN; THE ARRESTING DEPUTIES (SPIVEY,
DIXON, MILLS, GORE, AND JOHN DOES #1-5); THE SUPERVISING DEPUTIES (J.
HART, L. WYATT); JOHN DOES #6-15;

Defendants.

# SUMMARY OF THIS ACTION

The Plaintiff[1] seeks equitable (i.e., non-monetary) relief as remedy for a series of civil rights violations Plaintiff was subjected to within North Carolina's criminal justice system. Plaintiff claims fall into four broad catagories:

**(1) False Arrest and Seizure**

**(2) Abuse of the Legal Process**

**(3) Disability Discrimination / Retaliation**

**(4) Constitutional Challenge to a State Statute**
Citing federal disability laws (the Rehabilitation Act and the ADA), Plaintiff seeks declaratory relief that Defendants acted in violation of federal laws by repeatedly denying his lawful re

# STATUTORY BACKGROUND OF CIVIL RIGHTS LITIGATION
## Disability Rights

1. The Plaintiff is self-represented and presents a Complaint for Relief alleging civil rights violations seeking equitable relief. "[L]iberal construction of the pleadings is particularly appropriate where, as here, there is a *pro se* complaint raising civil rights issues." *Loe v. Armistead*, 582 F.2d 1291, 1295 (4th Cir. 1978) (citing *Haines v. Kerner*, 404 U.S. 519, 521 (1972); *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978); (additional citations omitted)).

2. A *pro se* complaint should only be dismissed "if it does not allege 'enough facts to state a claim to relief that is plausible on its face.'" *Giarratano v. Johnson*, 521 F.3d 298,

---

1    Technically, there are two Plaintiffs, but "Mr. Fuller" is referred to as "the Plaintiff" for simplicity of narrative in this pleading. Only one claim involves Anti-Tranny.Org which is a closely affiliated P.A.C. in the process of formation at the time of injury.

302 (4th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).

3.    Plaintiff's action alleges violations of Title II of the Americans with Disabilities Act
of 1990, as amended (the "ADA"), 42 U.S.C. §§ 12131-12134, and its implementing
regulation, 28 C.F.R. Part 35. *Plaintiff incorporates by reference his Complaint in EDNC case 7:18-cv-00059-FL.*

4.    The alleged discrimination goes to the heart of the ADA and Congress' intent to
eliminate the segregation and isolation of individuals with disabilities. As Congress
stated in the Findings and Purposes of the ADA: "historically, society has tended to
isolate and segregate individuals with disabilities, and, despite some improvements,
such forms of discrimination against individuals with disabilities continue to be a
serious and pervasive social problem." 42 USC § 12101(a)(2).

5.    Although it may be unusual for a private party may bring such claims *pro se,* the
USDOJ has intervened in similar disputes. Indeed much of the Plaintiff's claims are
taken from cases featured on the USCA4's website or the USDOJ's Disability Rights
Section of the USDOJ website.

6.    In an effort to resolve this action promptly, Plaintiff cites the following cases to
show that his claims are well founded in law:

**United States v. North Carolina, #5:12-cv-557, E.D.N.C. (2012-2021)**
https://www.ada.gov/olmstead/olmstead_cases_list2.htm#NC
*re: ongoing USDOJ oversight to better enable individuals in NC with mental
illness may participate more fully in community life.*

USDOJ: "NC fails to provide services to individuals with mental illness in the
most integrated settings appropriate to their needs in violation of the ADA...
NC has repeatedly failed to comply with its annual obligations under the
Settlement Agreement, lagging far behind schedule."

**Gorman v. Bishop (1996)**
https://www.ada.gov/briefs/gorman1br.pdf
*re: the Rehabilitation Act and the ADA expressly abrogate state sovereign
immunity and applies even in a criminal process.*

USDOJ: "Title II is intended to require police departments to make reasonable modifications to their policies, practices, and procedures, and to provide training to officers that will avoid discriminatory arrests of individuals with disabilities."

### Clark v. Virginia Board of Bar Examiners (1994)
https://www.ada.gov/briefs/clark3br.pdf
*re: unnecessary inquiries to determning fitness to practice law based upon one's status as a covered party with a mental impairment under ADA*

USDOJ: "A broad inquiry into an applicant's mental health history is not necessary to determining fitness to practice law... Title II prohibits [the Bar] from imposing unnecessary burdens on persons with disabilities at all stages of the licensing process, regardless of whether a license is eventually granted... As with other civil rights statutes, standing under the ADA should be interpreted as broadly as permissible under the Constitution."

### Hancock County, MS, Settlement Agreement (1997)
https://www.ada.gov/hancocks.htm
*re: persons who have communications impairments are to have equal opportunity to participate in the state courts*

USDOJ: "The County has established, and will continue to maintain, a written policy, which requires that the Circuit Court ensure that [those covered under the ADA] have an equal opportunity to benefit from the programs and services of the Courts."

### American Nurses Assoc. v. O'Donnell (2011)
https://www.ada.gov/briefs/ana_br.pdf
*re: when a state law directly conflicts with the ADA, the state law must be interpreted in a way that complies with the ADA*

USDOJ: "Under the Supremacy Clause, a state statute is preempted to the extent it conflicts with federal law... In a number of contexts, federal and state courts have correctly held that federal disability rights laws preempt state statutes to the extent they conflict with federal mandates."

**Williams v. the City of New York (2015)**
https://www.ada.gov/williams_new-york_soi.pdf
*re: Clarifying that Title II of the ADA requires that public entities, such as the*
*NYPD, must make reasonable modifications to accommodate an individual's*
*disability.*

USDOJ: "Title II applies to all law enforcement activities, including arrests... to communicate effectively with people with disabilities."

7.     Title II of the ADA, at issue in this dispute, provides that, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

8.     As defined by title II's implementing regulation, a public entity may not deny a qualified individual with a disability, "an opportunity to participate that is not equal to that afforded others," nor may it, "otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity" enjoyed by others receiving the services. 28 C.F.R. § 35.130(b)(1)(iii), (vii).

9.     If a requested modification is needed to ensure full and equal enjoyment by a person with a disability, then the modification is necessary to prevent discrimination on the basis of disability. 42 U.S.C. § 35.130(b)(7).

10.     Section 504, like title II, prohibits disability-based discrimination. 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."). In all ways relevant to this discussion, title II and Section 504 are generally construed to impose similar requirements.

## Viewpoint Discrimination

11.   The United States Supreme Court recently ruled that:

> "Serious viewpoint discrimination is now tolerated, and such
> discrimination has become increasingly prevalent in this country. At a time
> when free speech is under attack, it is especially important for this Court
> to remain firm on the principle that the First Amendment does not tolerate
> viewpoint discrimination. We reaffirm that principle today."
> *Iancu v. Brunetti*, No. 18–302, 588 U.S. ___ (2019)

12.   The U. S. Supreme Court has explicitly held that an illicit motive is the key
consideration when evaluating government agents for retaliation against an
individual's exercise of First Amendment rights. See *Heffernan v. City of Paterson*,
136 S. Ct. 1412, 1418 (2016) (affirming the primacy of official motivation where the
government took adverse action against an individual based on the mistaken belief
that he had engaged in protected speech).

13.   Under the established framework for analyzing free speech retaliation claims,
government defendants will be liable for violating the First Amendment if the
fact finder concludes that the defendants would not have taken action against the
plaintiff but for their intent to punish or suppress protected expression. See *Mt.
Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).

14.   When government officials are directly involved in efforts to stop certain
viewpoints they oppose, and when unsuccessful, those very same government
officials invoke the state's legal process in order to silence a speaker via criminal
prosecution, the First Amendment provides a powerful and necessary check on such
retaliation.

15.   The dangers of a single person being falsely arrested in retaliation for engaging
in protected speech critical of the government — without recourse against the

moving parties — chills the exercise of First Amendment rights to all people.

16. This chilling effect is especially concerning to those with minority viewpoints that have often been at a higher risk of government based "viewpoint discrimination" in a university environment.

## Abuse of the Criminal Justice Process

17. "Overcharging" is the unlawful process in which the moving parties act to prosecute a person for a crime in which the moving parties know are unfounded by the facts. The goal of "overcharging" is to use the criminal justice process itself as a weapon to punish the defendant and thereby signal to larger community that defendant's conduct is unacceptable. The hallmark of "Overcharging" is not the moving parties' failure to obtain a "guilty" verdict at trial, but rather the moving parties' inability to present any evidence at trial as to the legal elements of the crime alleged.

18. Such is the Plaintiffs claims for relief presented herein: (i) that his criminal prosecution for his written words was selective, arbitrary, malicious and retaliatory in motive. Plaintiff Fuller, via "overcharging," was then subjected numerous violations of his federally protected civil rights.

19. The right of individuals to express themselves on important public issues is a form of expression that "has always rested on the highest rung of First Amendment values." *Carey v. Brown*, 447 U.S. 455, 467 (1980).

20. The First Amendment exists to "protect the free discussion of governmental affairs," *Mills v. State of Ala.*, 384 U.S. 214, 218 (1966), and to enable "uninhibited, robust, and wide open" debate on public issues, *Watts v. United States*, 394 U.S. 705, 708 (1969).

21. The Fourth Amendment protects private persons from arbitrary arrests and

7

unreasonable forms of searches, seizures, and surveillance.

22.    When a state statute "interferes with the right of free speech or of association, a more stringent vagueness test should apply." *United States v. Williams*, 553 U.S. 285, 304, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008). Statutes that are so poorly drafted they fail "to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."

23.    A *prima facie* case of retaliation to punish free speech requires proof that: (i) the Plaintiff engaged in protected speech under the First Amendment, (ii) that Plaintiff suffered an adverse action at the hands of Defendants, and (3) there is a causal connection between the protected activity and the adverse action." *Ray v. Int'l Paper Co.*, 909 F.3d 661, 669 (4th Cir. 2018).

24.    In *In re Winship*, 397 U.S. 358 (1970), the U.S. Supreme Court held for the first time that the Due Process Clause of the Fourteenth Amendment protects a defendant "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."

## PARTIES

25.    Plaintiff, the ANTI-TRANNY POLITICAL ACTION COMMITTEE (in the process of formation) was created by Plaintiff Fuller on or about May, 1, 2016 in New Hanover County, North Carolina. It was in the process of becoming a "non-connected P.A.C." to raise funds under Federal Election Commission Rules[2] and to operate nationwide, critiquing "transgender theory" and promoting policy that aligns with Roman Catholic sexual ethics. All seed money to launch the Anti-Tranny Political Action Committee was provided by Plaintiff Fuller. Per F.R.C.P. #17(c)

2    See https://www.fec.gov/help-candidates-and-committees/registering-pac/understanding-nonconnected-pacs/

(2), the Anti-Tranny Political Action Committee is an "incompetant person" and is represented in this action in one claim only by a "next friend" being Plaintiff Fuller acting as a guardian *ad litem*.

26. Plaintiff, NAPIER SANDFORD FULLER, is a natural person and United States citizen. Plaintiff Fuller is a resident of New Hanover County, North Carolina. Plaintiff Fuller has a long history of political work for the Republican party: he has served on the executive board of the New Hanover County G.O.P. and as a delegate to the state G.O.P. convention: he has stood for election and has been appointed to several different government positions including a position that involved judicial function in a court of record: in that position Plaintiff Fuller had the power to subpoena witnesses and sign binding judicial orders. In all of Plaintiff Fuller's public records requests related to this action, Plaintiff Fuller was acting in his personal and private capacity and not in his role as a (quasi) judicial official, which he held pursuant to N.C. Gen Stat. § 160A-388. Plaintiff Fuller is a "qualified individual with a disability" pursuant to Title II of the Americans with Disabilities Act resulting in a "substantial limitation of a major life activity." See 28 C.F.R. 35.104 Plaintiff Fuller has a history of such impairments going back more than 30 years.

27. Defendant STATE OF NORTH CAROLINA receives money from the federal treasury and is subject to federal disability laws.

28. Defendant COUNTY OF NEW HANOVER is a unit of the State and receives money from the federal treasury and is subject to federal disability laws.

29. Defendant COUNTY OF ORANGE receives money from the federal treasury and is subject to federal disability laws.

30. Defendant MASSACHUSETTS INSTITUTE OF TECHNOLOGY (AKA "THE CORPORATION" OR "MIT") receives money from the federal treasury and is subject to federal disability laws and the Family Educational Rights and Privacy Act ("FERPA") which is codified at 20 U.S. Code § 1232g; 34 CFR Part

99.

31.    Defendant EDWARD J. M<sup>C</sup>MAHON was, at all times relevant to this action,

the Sheriff of New Hanover County and therefore a government agent sued in both

the individual and official capacities. Upon information and belief, Defendant

M<sup>c</sup>Mahon is, and has been at all times relevant to this action, a citizen and resident

of North Carolina.

32.    Defendant RICHARD A. BADDOUR was, at all times relevant to this action,

en elected judge and therefore a government agent sued in both the individual and

official capacities. Upon information and belief, Defendant Baddour is, and has been

at all times relevant to this action, a citizen and resident of North Carolina.

33.    Defendant ROSS STEVEN BARBEE was, at all times relevant to this action,

an UNC-CH police officer and therefore a government agent sued in both the

individual and official capacities. Upon information and belief, Defendant Barbee

is, and has been at all times relevant to this action, a citizen and resident of North

Carolina.

34.    Defendant CHARLES S. BLACKWOOD was, at all times relevant to this

action, the Sheriff of Orange County and therefore a government agent sued in

both the individual and official capacities. Upon information and belief, Defendant

Blackwood is, and has been at all times relevant to this action, a citizen and resident

of North Carolina.

35.    Defendant GARY L. BOWEN was, at all times relevant to this action, an

academic dean at UNC-CH and therefore a government agent sued in both the

individual and official capacities. Upon information and belief, Defendant Bowen

is, and has been at all times relevant to this action, a citizen and resident of North

Carolina.

36.    Defendant JAMES T. BRYAN, III was, at all times relevant to this action, an

elected judge and therefore a government agent sued in both the individual and

official capacities. Upon information and belief, Defendant Bryan is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

37. Defendant SAMANTHA HYATT CABE was, at all times relevant to this action, an elected judge and therefore a government agent sued in both the individual and official capacities. Upon information and belief, Defendant Cabe is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

38. Defendant LAURIE J. SELTZ-CAMPBELL was, at all times relevant to this action, a professor at UNC-CH and therefore a government agent sued in both the individual and official capacities. Upon information and belief, Defendant Seltz-Campbell is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

39. Defendant JOAQUIN REBECCA CARCAÑO was, at all times relevant to this action, an employee of UNC-CH and therefore a government agent sued in both the individual and official capacities. Upon information and belief, Defendant Carcaño is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

40. Defendant JAY JYOTI CHAUDHURI was, at all times relevant to this action, an elected member of the N.C.G.A. and therefore a government agent sued in both the individual and official capacities. Upon information and belief, Defendant Chaudhuri is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

41. Defendant ALEXA Z. CHEW was, at all times relevant to this action, an academic professor at UNC-CH Law School and therefore a government agent sued in both the individual and official capacities. Upon information and belief, Defendant Chew is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

42. Defendant LINDA CHRISTINE CHUPKOWSKI was, at all times relevant to

this action, an employee of UNC-CH and therefore a government agent sued in both the individual and official capacities. Upon information and belief, Defendant Chupkowski is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

43. Defendant WANDA COPLEY was, at all times relevant to this action, the county attorney and therefore a government agent sued in both the individual and official capacities. Upon information and belief, Defendant Copley is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

44. Defendant CHRIS COURDRIET was, at all times relevant to this action, the county manager of New Hanover and therefore a government agent sued in both the individual and official capacities. Upon information and belief, Defendant Courdriet is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

45. Defendant BLAKE MATTHEW COURLANG was, at all times relevant to this action, an assistant district attorney in Orange County and therefore a government agent sued in both the individual and official capacities. Upon information and belief, Defendant Courlang is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

46. Defendant TERRY VAN DUYN was, at all times relevant to this action, a member of the N.C.G.A. and therefore a government agent sued in both the individual and official capacities. Upon information and belief, Defendant Van Duyn is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

47. Defendant JAMES F. ELLIS was, at all times relevant to this action, an officer in the UNC-CH Police and therefore a government agent sued in both the individual and official capacities. Upon information and belief, Defendant Ellis is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

48. Defendant SUSI H. HAMILTON was, at all times relevant to this action, a

member of the N.C.G.A. or similar such role and therefore a government agent sued in both the individual and official capacities. Upon information and belief, Defendant Hamilton is, and has been at all times relevant to this action, a citizen and resident of North Carolina

49.    Defendant REBEKA D. HARDEE was, at all times relevant to this action, an investigator for the district attorney in Orange County and therefore a government agent sued in both the individual and official capacities. Upon information and belief, Defendant Hardee is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

50.    Defendant REBECCA W. HOLT, was, at all times relevant to this action, an elected judge and therefore a government agent sued in both the individual and official capacities. Upon information and belief, Defendant Holt is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

51.    Defendant SHARON HUFFMAN was, at all times relevant to this action, a deputy county attorney and therefore a government agent sued in both the individual and official capacities. Upon information and belief, Defendant Huffman is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

52.    Defendant STEPHEN C. KEADEY was, at all times relevant to this action, an attorney of UNC-CH Office of Counsel and therefore a government agent sued in both the individual and official capacities. Upon information and belief, Defendant Keadey is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

53.    Defendant DAVID THOMAS LAMBETH, III was, at all times relevant to this action, an attorney of UNC-CH Office of Counsel and therefore a government agent sued in both the individual and official capacities. Upon information and belief, Defendant Lambeth is, and has been at all times relevant to this action, a citizen

and resident of North Carolina.

54.     Defendant KRISTEN SIMONSEN LEWIS was, at all times relevant to this action, an attorney of UNC-CH Office of Counsel and therefore a government agent sued in both the individual and official capacities. Upon information and belief, Defendant Lewis is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

55.     Defendant WILLIAM FITZHUGH MASSENGALE was, at all times relevant to this action, an assistant district attorney in Orange County and therefore a government agent sued in both the individual and official capacities. Upon information and belief, Defendant Massengale is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

56.     Defendant JEFF MᶜCRACKEN was, at all times relevant to this action, an UNC-CH police officer and therefore a government agent sued in both the individual and official capacities. Upon information and belief, Defendant MᶜCracken is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

57.     Defendant MARK W. MERRITT was, at all times relevant to this action, an attorney of UNC-CH Office of Counsel and therefore a government agent sued in both the individual and official capacities. Upon information and belief, Defendant Merritt is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

58.     Defendant JEFFREY LARKIN NIEMAN was, at all times relevant to this action, an assistant district attorney in Orange County and therefore a government agent sued in both the individual and official capacities. Upon information and belief, Defendant Nieman is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

59.     Defendant TONY M. OAKLEY, was, at all times relevant to this action, an appointed magistrate judge and therefore a government agent sued in both the

individual and official capacities. Upon information and belief, Defendant Oakley is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

60. Defendant DAVID PARKER was, at all times relevant to this action, an attorney of UNC-CH Office of Counsel and therefore a government agent sued in both the individual and official capacities. Upon information and belief, Defendant Parker is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

61. Defendant TERRI PHOENIX was, at all times relevant to this action, the tzar (i.e., the ruler) of UNC-CH's LGBTQ Center and therefore a government agent sued in both the individual and official capacities. Upon information and belief, Defendant Phoenix is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

62. Defendant CHRISTOPHER MICHAEL SGRO was, at all times relevant to this action, an appointed member of the N.C.G.A. and therefore a government agent sued in both the individual and official capacities. Upon information and belief, Defendant Sgro is, and has been at all times relevant to this action, a citizen and resident of North Carolina although he has now moved to the Washington DC area.

63. Defendant NEERA MAKWANA SKURKY was, at all times relevant to this action, an attorney of UNC-CH Office of Counsel and therefore a government agent sued in both the individual and official capacities. Upon information and belief, Defendant Skurky is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

64. Defendant JAMES C. STANFORD was, at all times relevant to this action, an elected clerk of the court in Orange County and therefore a government agent sued in both the individual and official capacities. Upon information and belief, Defendant Stanford is, and has been at all times relevant to this action, a citizen and

resident of North Carolina.

65. Defendant JOSHUA STEIN was, at all times relevant to this action, an elected member of the N.C.G.A. or the attorney general of North Carolina and therefore a government agent sued in both the individual and official capacities. Upon information and belief, Defendant Stanford is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

66. Defendant CATHERINE C. STEVENS, was, at all times relevant to this action, an "emergency judge" that did not have approval of the N.C. Bar to act in a judicial capacity due to an invalid law license yet was nonetheless a government agent sued in both the individual and official capacities. Upon information and belief, Defendant Stevens is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

67. Defendant JAMES R. WOODALL, JR. was, at all times relevant to this action, the district attorney of Orange County and therefore a government agent sued in both the individual and official capacities. Upon information and belief, Defendant Woodall is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

68. Defendant LISA DE SAXE ZERDEN was, at all times relevant to this action, an academic dean at UNC-CH and therefore a government agent sued in both the individual and official capacities. Upon information and belief, Defendant Zerden is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

69. Defendant JOHN DOES #1-5 are a sworn deputies of the New Hanover County Sheriff's Department. At the time of the events at issue, they were acting within the scope of their employment and under color of law by New Hanover County. They are sued in their individual capacity.

70. All other unknown natural persons (JOHN DOES #6-15) are named as DEFENDANTS are at all times relevant to this action, are (or were) citizens and residents of North Carolina and are sued their individual and professional capacities.

JURISDICTION

71.  This civil action arises under the Third Ku Klux Klan Act of 1871, 42 U.S.
     Code § 1983, as amended, to remedy the "deprivation of any rights, privileges,
     or immunities" secured by the United States Constitution and federal law as it
     relates to the First, Fourth, Fifth, Eighth and Fouteenth Amendments and to federal
     disability laws: Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42
     U.S.C. § 12132., Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"),
     29 U.S.C. § 794a.

72.  This United States District Court has original jurisdiction over Plaintiff's
     constitutional and federal law claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. §
     1343(a) and §§ 2201 (remedy).

73.  This civil action also presents claims that have arisen under the Article I of the
     North Carolina Constitution, §§ 5, 19, 20, 21, 35, and 36; and other North Carolina
     general statutues: § 168A "North Carolina Persons With Disabilities Protection Act;"
     § 168 "Persons with Disabilities."

74.  This United States District Court has supplemental jurisdiction over Plaintiff's
     state law claims pursuant to 28 U.S.C. § 1367(a) because they are part of the same
     case and controversy described by Plaintiffs' federal claims, and independent
     original jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1332
     because this action is between citizens of different states.

## VENUE

75.  Venue in the Eastern District of North Carolina is based on 28 U.S. Code §
     1391(b) because many of the events giving rise to this claim occurred in the Eastern
     District of North Carolina and many of the Defendants reside in the Eastern
     District of North Carolina.

76.    Tolling and Accrual of the statute of limitations for each claim is to be governed
       by federal law, 28 U.S. Code § 1658, or other such provision consistent with a
       specific federal claim that avoids perverse incentives.

77.    Absent the Court's finding that Plaintiff has pursued these claims in bad faith as
       an abuse of the legal process per 28 USC § 1927, Plaintiff seeks ordinary expenses of
       litigation per 42 USC § 1988, 28 USC § 1920, 28 USC § 1821(b), and the Civil Rights
       Attorney's Fees Awards Act of 1976.

## FACTUAL ALLEGATIONS

78.    Between January 1, 2016 and August 2, 2016, Plaintiff Napier Sandford Fuller
       (hereafter "Mr. Fuller") voiced his concerns about illegal lobbying activities of
       UNC-CH staff to further LGBT ideologies that he suspected had been undertaken
       with public funds in the scope of their employment with tacit approval from the
       UNC-CH administration: i.e., that taxpayer funds were directly being spent on
       promoting "transgender theory" that was in conflict of his deeply held religious
       and political views.

79.    Between January 1, 2016 and August 2, 2016, Mr. Fuller requested public records
       in US Mail and also via email stating, "I am greatly concerned about the undue
       influence of the LGBT lobby..." to the following members of the North Carolina
       General Assembly:

       May 28, 2016      N.C. Senator Josh Stein
       May 28, 2016      N.C. Senator Jay Chaudhuri
       May 29, 2016      N.C. Senator Terry Van Duyn
       June 1, 2016      N.C. Rep. Susi H. Hamilton

80.    None of these elected officials have complied with Mr. Fuller's many public
       records' requests.

81.    Mr. Fuller also made several public records' requests to investigate the communications of "transgender theory" activists at UNC-CH with the goal discovering and reporting criminal violations: it is unlawful for state employees to use taxpayer resources further political or religious ideology no matter how deeply held those view are.

82.    Neither UNC-CH affiliates (Ms. Setz-Cambell, Ms. Chupowski, nor Joaquin Carcano) have complied[3] with Mr. Fuller's many public records' requests that started in 2016.

83.    On August 3, 2016, Mr. Fuller received a response from UNC-CH: from David Parker, the Vice Chancellor and General Counsel:

> I am writing in response to your recent message to [UNC Counsel] Steve Keadey.  In that message you noted that you have recently filed a public records request with the University. I hope that by now you have received acknowledgement from the office handling those matters, but if not please let me know and I will follow up up with them.  You also stated, in regard to two University employees:
>
> "It appears that UNC employees, Ms. Campbell and Ms. Chupkowski, by signing the attached [transgender rights' petition], have directly attempted to lobby the governor of NC in their role as UNC employees, so-called "mental health providers" in favor of "transgender theory." Such actions would appear to be a clear violation of NC lobbying law, chapter 120C, a criminal offense, class 1 misdemeanor, with a jail sentence of up to 120 days and up to a $5,000 fine.  I am considering filing a formal complaint with the NC Ethics Commission, but I would like to get UNC's response first — are these two individuals officially representing UNC? — are they authorized and registered to lobby for UNC?"
>
> Thank you for bringing this question to our attention.
>
> I have reviewed Chapter 120C.  I can find no basis to conclude that Ms. Campbell or Ms. Chupkowski violated these North Carolina lobbying laws or University policy...
>
> Indeed, such communications appear quite clearly to be protected free speech under University policy, as well as North Carolina and federal law.

---

3    One person did provide a response, yet avoided compliance.

Kind regards,
*David Parker*

Interim Vice Chancellor and General Counsel

84.   This response from the top echelon of UNC-CH's hierarchy struck Mr. Fuller as suspicious: the General Counsel (i) avoiding providing the requested documents, (ii) offered a legal opinion that Mr. Fuller's concerns had no merit, and (iii) avoiding the topic of how much public funds UNC-CH spent on furthering "transgender ideology."

85.   Mr. Fuller later discovered that Mr. Parker was a man "married to a man" with a long history of gay rights' activism. Mr. Parker's decision to personally take control of Mr. Fuller's complaint and declare it as merit-less was unusual.

86.   Mr. Parker's discretionary involvement in Mr. Fuller's complaint -- about taxpayer funds going to LGBTQ activism at UNC-CH -- lacked objectivity: i.e., Mr. Parker was likely involved in setting up the very LGBTQ activism that Mr. Fuller sought to bar based upon ethics: e.g., UNC-CH could study his faith, Roman Catholicism, as an academic exercise but it was barred from advocating for Roman Catholicism in terms of official policy or practice.

87.   This same principal did <u>not</u> seem to apply to the religious like dogmas held by UNC-CH's LGBTQ advocates: not only did UNC-CH have a "gender studies" department, it had an LGBTQ Center that had paid staff that essentially encouraged "gay sex" both in practice and as an ideological objective (i.e., to remove the stigma; to counter "homophobia," to encourage such sexual acts amongst students at UNC-CH).

88.   Mr. Parker failed to respond to Mr. Fuller's concerns about UNC-CH's celebrity employee, Joaquin Carcano, who had become the "Rosa Parks" of the transgender movement: Mr. Fuller wondered how much work Carcano actually did for UNC-

CH being that Carcano was involved in a landmark legal struggle to further "transgender ideology." Carcano was suing the State of North Carolina for access to enter the bathroom of his choice: a curious cause.

89.  Mr. Fuller suspected that Carcano had little or no professional responsibilities at UNC-CH: i.e., if UNC-CH had been exposed for having fake classes could UNC-CH also have fake employees.?

90.  On September 21, 2016, Mr. Fuller filed an informal complaint with the NCDOJ seeking their help to gain access to the public records that UNC-CH's Office of Counsel controlled. That complaint mentioned Mr. Fuller's intent "to file an action in Superior Court  pursuant to the Uniform Declaratory Judgment Act, N.C. Gen. Stat. § 1-253, and North Carolina's Public Records Act, N.C. Gen. Stat. §§ 132, to challenge [UNC-CH's] non-compliance with [Mr. Fuller's] lawful public records request."

91.   Between September 21, 2016 and January 25, 2017, Mr. Fuller made several more requests by email to officials at UNC-CH requesting they comply with his public records request.

92.  Frustrated at the lack of cooperation, Mr. Fuller expressed his displeasure with some UNC-CH staff by stating via email, "I'm a NC Resident who pays your salaries. [I'm] PISSED OFF because you've engaged in a criminal act -- unlawful lobbying of the NCGA -- and yes I'm going to file a complaint... I looked at [your department] and the faculty is scarry -- all 3rd rate schools for PhDs and undergrad programs -- where are the MIT Harvard Yale Princeton Stanford Oxon/Cantab crowd?... It's like the blind leading the blind... looks like a breeding for diesal dykes if you ask me!"

93.  As the dispute dragged on, Mr. Fuller would add some quips in his messages: i.e., the UNC-CH staff needed "years of therapy" to get out of their "progressive echo chamber," and that they were far from an elite, but rather the butt of many

jokes.

94. Unknown to Mr. Fuller, between September 21, 2016 and January 22, 2017 the UNC-CH Office of Counsel was intently focused on avoiding the consequences of the "fake classes." On information and belief, UNC-CH Office of Counsel spent about $18 million on lawyers and investigators to avoid being expelled from the NCAA in what had become the largest academic fraud in American history.

95. On information and belief, UNC-CH's annual revenue from its "Tar Heel" sports franchise exceeds $100 million per annum yet it pays the NCAA stars nothing. Hence, Mr. Fuller's frenetic allegations of criminal activity of UNC-CH staff was quickly brought to the attention of the highest levels of UNC-CH Office of Counsel.

96. Yet Mr. Fuller was unaware that the UNC-CH Office of Counsel has a loyalty to the university and not to whisteleblowers.

97. Instead of investigating Mr. Fuller's concerns and providing the requested public records, UNC-CH Office of Counsel quickly turned the tables: eventually arresting Mr. Fuller what what was basically his conduct in reporting the illegal activity.

98. Although the frivilious "harassment" charges were resolved in Mr. Fuller's favor, it allowed UNC-CH to depict Mr. Fuller as a man motivated by bitterness.

99. Yet a careful review of the timeline of events shows that Mr. Fuller was the initial whistelblower to UNC-CH and yet ended up in jail based upon "harassment" allegations by the very targets of his report.

100. During the course of Mr. Fuller's criminal prosecution, Mr. Fuller came into the possesion of significant corpus of internal "leaked" emails from officials at UNC-CH that support his timeline of events.

101. The following persons had a direct and leading role in the meeting of minds that led to the decision to issue the criminal process against Mr. Fuller on February 1, 2017. These people are listed here:

| David Parker | UNC-CH Office of Counsel |
| Mark Merrit | UNC-CH Office of Counsel |
| Neera M. Skurky | UNC-CH Office of Counsel |
| Kristen Simonsen Lewis | UNC-CH Office of Counsel |
| Steve Keadey | UNC-CH Office of Counsel |
| David Lambeth | UNC-CH Office of Counsel |
| Ross S. Barbee | UNC-CH Police |
| Gary L. Bowen | UNC-CH Dean |
| Terri Phoenix | UNC-CH Professor |
| Alexa Chew | UNC-CH Professor |
| Laurie Selz-Cambell | UNC-CH Professor |
| Jeff Nieman | Orange County prosecutor |
| Blake Courlang | Orange County prosecutor |
| Jim Woodall | Orange County prosecutor |

102.     Despite clear guidance[4] from the USDOJ issued in January 2017, none of these
people listed in the previous paragraph were trained in how to identify and to best
approach a suspect that has an unseen mental disability: i.e., that knew that Title II
of the A.D.A. applied to law enforcement agencies. On information and belief, these
individuals  failed to develop "policies, procedures, and training on diversion, de-
escalation, release planning, use of force, and discipline" that would avoid persons
with unseen mental disabilities like Plaintiff from unnecessary involvement in the
criminal justice system.  These these individuals further failed to take appropriate
steps required by federal law (42 USC §§ 12131-12134  and 28 CFR pt. 35) to ensure
that communication with Mr. Fuller, a person with a covered disability, was as
effective as communication with people without such disabilities, and further failed
to provide auxiliary aids and services when necessary to afford Mr. Fuller an equal
opportunity to participate in the covered entities' activities.

103.     Despite having different roles such as "prosecutor" or "dean," the internal
emails show that in-house attorneys at UNC-CH conceived and orchestrated Mr.
Fuller's "harassment" arrest in a way that would require him to be placed into jail:

---

4     See https://www.ada.gov/cjta.html

typically a person like Mr. Fuller with no criminal record would have just been issued a summons to appear. Yet UNC-CH officials specifically pursued a process that required Mr. Fuller's arrest and detention by issuing two separate arrest warrants.

104.    Here are some excerpts from the emails in this trove of "leaked" internal documents between high ranking UNC-CH officials named in ¶ 101:

> December 27, 2016
> "Napier S. Fuller, Esq. sent concerning emails regarding transgender mental health... we're in the process of working with the University Counsel..."
>
> January 17, 2017
> "I have sent [Mr. Fuller's email] to the Detective at [UNC PD] and also the lawyer with University Council... just wanted you to know we're on this, Oy Vey!⁵"
>
> January 23, 2017
> "[We are] preparing court orders to determine the identity of the sender for all of the email addresses that have been used since there are multiple ones. This will be necessary [to arrest Mr. Fuller]..."
>
> January 23, 2017
> "I appreciate your direct intervention..."
>
> January 24, 2017
> "Just wanted you to know we're on this..."
>
> January 31, 2017
> "I know this is the opinion of a handful of people but they are the folks who have been receiving [Mr. Fuller's] communications..."

105.    Never does any of the UNC-CH officials named in ¶ 101 mention that Mr. Fuller's criticisms and requests for public records might be protected under the First Amendment.

106.    Rather the "echo chamber" effect results in a view that Mr. Fuller should be

---

5       Yiddish expression; translates to "Holy Shit!"

punished for his homophobic "hate speech."

107. A document obtained by Mr. Fuller, shows clear evidence that an attorney with the UNC-CH Office of Counsel, Neera M. Skurky, was drafting documents for the UNC-CH Police on January 7, 2017 suggesting that Mr. Fuller might be charged for a criminal act *before* there had even been a complaint of such an act. *See Exhibit A.*

108. Mr. Fuller received such a letter by certified mail on or about January 26, 2017 from UNC-CH's in-house police force. The letter was signed by UNC-CH's Officer Barbee and threatens criminal charges might be brought against Mr. Fuller: he should leave UNC-CH officials alone.

109. Mr. Fuller called Officer Barbee in a recorded telephone call. Mr. Fuller states that his contact with UNC-CH staff was lawful and cannot be prosecuted as a criminal offense as his intent was political and religious. Officer Barbee ends the call by saying "Okay" signaling agreement with Mr. Fuller's position

110. On February 1, 2017 upon the approval of UNC-CH Office of Counsel and Orange County prosecutors, Mr. Barbee issued two warrants for Mr. Fuller's arrest for "harassing communications." Both warrants are nearly identical and do not identify any victims of the "crime" with any specificity.

111. Here is the verbatim language of the arrest warrant for 17-CR-05341:

> "I, the undersigned, find that there is probable cause to believe that on or about the date of offense shown and in the county named above the defendant named above unlawfully and willfully did REPEATEDLY EMAIL FACULTY AND STUDENTS OF THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL LGBTQ CENTER FOR THE PURPOSE OF ANNOYING AND/OR EMBARRASSING THEM."

112. Internal documents obtained by Mr. Fuller between the UNC-CH Office of Counsel and Orange County prosecutors are devoid of any discussions about First Amendment protections or establishing probable cause.

113.    On the morning of February 2, 2017 about 10:45am, Mr. Fuller was pulling into one of his industrial properties in his blue 2008 Toyota Prius when he first observed the blue lights of a police car in his rear view mirror.

114.    Mr. Fuller had arrived at the properties (three adjacent warehouses totaling about 40,000 ft²) for a meeting about an architectural modification: the buildings were fully leased.

115.    Seeing the blue lights, Mr. Fuller pulled his car over in the rear the northernmost warehouse property (#5648 Barbados Blvd., Castle Hayne NC): there was no traffic in this portion of the complex which is used for truck storage.

116.    Mr. Fuller observed a law enforcement vehicle draw up close behind his Toyota and flashed his blue lights.

117.    After some delay, a New Hanover County Sheriff's deputy (believed to be "Corporal Spivey") approached Mr. Fuller's parked vehicle at 5648 Barbados Blvd. and requested identification through Mr. Fuller's driver's side window that was then rolled down.

118.    When Mr. Fuller moved his hands to comply with the police order, the deputy became frightened and ordered Mr. Fuller (in a much louder and aggressive tone) to put his hands back on the Toyota's steering wheel.

119.    Mr. Fuller complied.

120.    At this point, Mr. Fuller became very frightened because of the belligerent tone of the deputy.

121.    The deputy then chastised Mr. Fuller for reaching to fast and adopted a very confrontational "command presence" persona.

122.    Mr. Fuller has an unseen mental disability that is regarded as "severely impairing. " Specifically, people with this disorder often experience "emotional dysregulation" which is an "inability to manage the intensity and duration of negative emotions." In plain English, people with this disorder can quickly

become so disproportionately upset that it becomes difficult for them to function -- physically, emotionally, and behaviorally.

123.    In this state, they can become very impulsive and even violent -- to avoid this outcome, they are encouraged to disengage and withdraw from a source of conflict.

124.    The deputy (believed to be have the surname "Spivey") continued to increase the intensity of the encounter by making more orders and belittling Mr. Fuller's efforts to comply to such an extent that Mr. Fuller was loosing control of his emotions -- i.e., his heart was racing and his eye watered due to fear.

125.    To regain control, Mr. Fuller shut his eyes and started to pray -- keeping both hands on the steering wheel and disengaging from Deputy Spivey and remained silent -- the adrenaline release causes Mr. Fuller to shake in his extremities.

126.    At some point Deputy Spivey returned to his patrol called for back up.

127.    Just as Mr. Fuller was starting to regain his mental composure, four more law enforcement vehicles arrived on the scene in what could be described as a "SWAT Team" like escalation.

128.    Mr. Fuller remembers one deputy with a long gun and another with body armor moving in from different positions: despite a great effort to review the video, it has not been available for review to prepare a more accurate account.

129.    Mr. Fuller became so frightened it was if he was paralyzed -- he was so drained from the previous episode-- that he could hardly move.

130.    At that point, Mr. Fuller assumed there had been a case of mistaken identify and feared for his life -- in fact the New Hanover County deputies had a suspect in a similar situation -- by approaching the suspect from multiple angles and then opening fire without good reasons -- killing him.

131.    Eventually, Mr. Fuller was ordered by one of the deputies to step out of his vehicle -- by this time most of the warehouse employees (i.e, Mr. Fuller's leasees) in the industrial complex were watching the police scene unfold.

132.	Mr. Fuller was handcuffed and informed that multiple arrest warrants issued from Orange County -- Mr. Fuller exited his Toyota and was then taken into custody.

133.	At all times during the arrest process on February 2, 2017, Mr. Fuller was unarmed and tried to comply with the commands given to the him by the aresting officers.

134.	On or before 11:15 AM E.S.T. on February 2, 2017, the stress of the law enforcement encounter was so intense as to plunge Mr. Fuller into a psycotic like state: i.e., Mr. Fuller was trembling and feared for his life: indeed police homicides (i.e., police killing suspects) is listed as one of the top 50 causes[6] of death for young men.

135.	Video footage of this portion of the "dash cam" video shows Mr. Fuller as he was handcuffed and given a quick pat-down for weapons.

136.	By the time of the "incidental frisk" pursuant to Mr. Fuller's arrest, there are many deputies at the scene, crowding around Mr. Fuller.

137.	One deputy[7] asks Mr. Fuller if he is carrying needles, another deputy looks into Mr. Fuller's nose for powder, and another asks if he has any drugs on his person -- Mr. Fuller responds in the affirmative -- in a meek tone, "I have mythlyphenidate; I'm prescribed it by a medical doctor " (or words ot that effect).

138.	Then Mr, Fuller is ordered to look a point on the horizon, and given notice that an additional search will be conducted by an officer with gloves.

139.	Mr. Fuller looks at the horizon and feels a hand enter his back pockets, making first a exploratory fingering motion and then a pinching motion as to remove any tiny fragment of lint -- through the material, the fingers make direct contact with his buttocks -- Mr. Fuller is aware that an evidence bag is being used but cannot see

---

6	See https://www.cbsnews.com/pictures/death-index-top-50-ways-americans-die/

7	Not yet identified. Attorneys representing the New Hanover County Sheriff's Department have refused to release the video footage of Mr. Fuller or even to fully identify the arresting officers involved.

what is going on.

140. Mr. Fuller is aware that the deputies seem excited -- that this process is now morphing into a drug bust.

141. Mr. Fuller tries to remain calm and doesn't speak -- submitting to the search.

142. Soon Mr. Fuller feels the hand enter into his front pocket -- the design of the front pant pockets are quite deep -- resulting in the fingers making direct and contact with his penis and scrotum through the fabric.

143. The fingers methodically explore the pocket and try to pinch any loose particle resulting in his scrotum sac being briefly pinched.

144. The process is repeated in the other pocket.

145. Mr. Fuller is repulsed by this direct contact with his genitals -- highly offensive -- while the deputy while ordered him to look away.

146. The deputies put more something into a evidence bag.

147. Throughout this invasive search of his person, Mr. Fuller's clients were gawking -- it was carried out in full view in the middle of the day.

148. Fearing that addition drug charges are possible, Mr. Fuller states, "I have the prescription in the car" or words to that effect. No deputies respond and Mr. Fuller is walked his clients in handcuffs and placed in the cage part of the deputy's cruiser.

149. Mr. Fuller is physically detained and positioned so that he cannot see what's going on with his Toyota. After a few minutes, a deputy demands Mr. Fuller's key stating the Toyota needed to be moved for safety so as not to block the traffic.

150. Yet Mr. Fuller's car was not blocking any traffic nor was it a safety hazard: it was parked in the rear of a building that Mr. Fuller owned.

151. Mr. Fuller suspected that the deputies were going to search his Toyota without a warrant to further whatever theory that had developed.

152. At no point did Mr. Fuller permit the deputies to search his Toyota or to enter it.

153. Eventually Mr. Fuller's key was returned by a deputy, and Mr. Fuller was

taken to jail in the cage like enclosure of a police car while in handcuffs. Once he returned to the car after being released several hours later, the prescription for the medication leading to his arrest was clearly visable in the front passenger's side -- it was sitting on the floor boards in plain view.

154.    Once in the New Hanover County jail, Mr. Fuller stripped on all his personal effects. Mr. Fuller bonded out after spending about 4 hours in jail.

155.    Mr. Fuller's mugshots were released to the press the following day and can still be easily found on the Internet.

156.    On or about February 20, 2017 Mr. Fuller filed a Motion to Dismiss both of the UNC-CH charges (17-CR-050340 17-CR-050341) based upon free speech. Excerts of that motion are presented herein:

> Mr. Fuller, 43, is a convert to the Roman Catholic faith and is approved by the Roman Curia to provide formation in human sexuality....

> Mr. Fuller, acting upon sincerely held religious beliefs, started to investigate the UNC School of Social Work and the UNC LGBT Center due their public advocacy to our state's youth promoting "transgender ideology" via a petition to the NCGA as well as the filing of a federal lawsuit, backed by the ACLU, of a UNC employee, "Joaquin Carcaño," who claims to be a discriminated against "transgendered person."

> On February 2, 2017 at about 10:45am Mr. Fuller was shocked to be arrested at gunpoint at a business meeting in front of his clients...

> This Court should dismiss the charges with prejudice as there is no evidence to support the charges and no probable cause existed to issue arrest warrants. NC Cyberstalking Law § 14-196.3(e) specifically excludes political and religious communications: this was made clear to UNC Police before the arrest warrant was issued... Mr. Fuller is a taxpayer and resident of North Carolina and has every right to express his displeasure in the actions of the state actors.

> Furthermore, Mr. Fuller argues that his first amendment rights have been violated per free speech and the petition of the government (i.e., UNC) for redress of wrongdoing. Mr. Fuller sincerely believes the arrest warrants to be retaliatory in nature designed to stop Mr. Fuller from investigating wrongdoing at UNC which is itself reeling from numerous scandals: fake classes, academic fraud, and sexual abuse.

157.   On or about March 20, 2017, before the Court could rule on this motion, Mr.
Fuller was unexpectedly presented, verbally, via a third-party (hereafter "the
Intermediary,") a secret plea offer to the effect of "Stop contacting the UNC-CH staff
for 60 days and the charges will be dropped on a handshake."

158.   Mr. Fuller inquired whom would have the authority to extend such an offer. The
Intermediary responded, "Jim Woodall, the district attorney. I have spoken to him
directly about this matter."

159.   Mr. Fuller asked how the district attorney planned to skirt the First Amendment
in a prosecution with a strong free speech defense. The Intermediary responded
"none of that federal stuff matters until you get to an appellate court," (or words to
that effect).

160.   Mr. Fuller told the intermediary, "you can have my answer now to convey back
to Mr. Woodall so longs as it's verbatim, tell me 'fuck you, I'm going to sue you in a
federal counter-suit via Section 1983 once this is all over because I've committed no
crime.'" (or words to that effect).

161.   The self-represented Mr. Fuller had become aware of the Section 1983 remedy
upon advice of counsel.

162.   On the day of the District Court trial (or technically speaking a "probable cause
hearing" per *Colten v. Kentucky*, 407 U.S. 104 (1972)), on July 20, 2017, the original
judge was replaced unexpectidley with an "emergency judge" Catherine Stevens.

163.   The State presented four emails it claimed Plaintiff Fuller has send to Defendant
Phoenix in violation of a criminal law. *See Exhibit E.*

164.   On information and belief, Ms. Stevens retired in 2000 and was not in good
standing with the N.C. Bar at the time of the hearing.

165.   As a point of law, Mr. Fuller avers that Ms. Stevens was not a "real judge" as she
had not been appointed to his case pursuant to due process of law (there must first
be an emergency to cause the original judge to withdraw on the day of trial.

166. Nonetheless, Mr. Fuller prevailed in the chaotic trial many LGBT activists were present in the courtroom. At one point the fire alarm was triggered resulting in the evacuation of the courthouse while Mr. Fuller was conducting a cross examination.

167. The eldery Ms. Stevens often became confused between the two counts and at one point, observed, "I'm going to find [Mr. Fuller] 'guilty' on one and 'not guilty' on the other," or words to that effect.

168. Nonetheless, Mr. Fuller was delighted to find that Ms. Stevens entered 'not guilty' verdicts of record in <u>both</u> charges: terminating cases 17-CR-050340 and 17-CR-05031 in Mr. Fuller's favor.

169. Both parties agree that the Phoenix prosecution has been terminated in Mr. Fuller's favor and it was served via an arrest warrant unique to that particular charge -- therefore all elements are met for a Section 1983 claim.

170. Despite Plaintiff Fuller's numerous requests for disability accomodations, none were provided by the state employees.

171. Plaintiff Fuller therefore refiles the claims in the 2018 *Fuller v Holt* case and incorporates that complaint. *See Exhibit F.*

172. This federal case was dismissed without prejudice with the idea that the State of North Carolina would transfer the claims back into its courts: that did not happen and thus there has been no adjudication despite Plaintiff Fuller's many legal efforts to obtain review from the N.C. Courts.

173. As part of the criminal investigation of Plaintiff Fuller, Defendant Barbee of UNC-CH Police contacted MIT Police and made inquiries; MIT Police responded to UNC-CH Police that Mr. Fuller was indeed an alumnus, but did not have criminal background. In what appears to be a violation of F.E.R.P.A., MIT Police released confidential donor profile information on Mr. Fuller to UNC-CH Police in secret -- even though that information was not requested.

174. From 2001 onwards, MIT was aware that Mr. Fuller has a mental disability so

severe that he is a "covered party" under A.D.A. Indeed MIT treated Mr. Fuller and helped arrange for his "reasonable accommodations" under A.D.A.

175.     Despite being recommended by the president of MIT's alumni society of North Carolina and taking a class in how to conduct alumni interviews, Mr. Fuller was not permitted to be an MIT alumni interviewer.

176.     Considering Mr. Fuller has contributed financially to MIT and made significant intellectual achievements (e.g., his I.P. has been cited some 35 times), a reasonable person could conclude that Mr. Fuller was not promoted to the position as an alumni interviewer on account of this "harassment scandal" despite winning all three criminal cases that have fully terminated and having a mental disorder in which the symptoms are speaking without understanding the emotional tones (i.e., more.

### CAUSE OF ACTION #1:
### FALSE ARREST AND UNLAWFUL DETENTION
### IN VIOLATION OF 42 U.S. CODE § 1983
### (LGBTQ COMPLAINT LACKED PROBABLE CAUSE)
*Against Defendants Bowen, Phoenix, Barbee, Ellis, McCracken, Neiman, Woodall, Massengale, , Hardee, Courlang, Skurky, Lewis, Parker, Lambeth, Merrit, Chew, and Woodall in their individual capacity*

177.     Plaintiffs incorporate all other prior paragraphs in this complaint.

178.     Defendants are "persons," as that term is used in the text of 42 U.S. Code § 1983 and are sued as individuals.

179.     Defendants conspired to develop a "limited reporting protocol" that was, in reality, intended to conceal and obfuscate evidence of Plaintiff's innocence and to cover-up Defendants' illegal search of the Plaintiff's vehicle after no evidence of contraband was discovered.

180.     On information and belief, the circumstances giving rise to this claim against Defendants were not insulated via an intermediary's independent approval,

such as a prosecutor or judicial officer that would be expected to be neutral and disinterested. For example, the senior prosecutor, Mr. Woodall, is married to a UNC-CH administrator: many other such conflicts of interest exist.

181. Under color of state law, Defendants listed above, acting individually and in concert, initiated and continued an investigation that resulted in an arrest warrant being issued. *See Exhibit D.*

182. Defendants listed above took actions that were malicious and evidenced a reckless and callous disregard for, and deliberate indifference to, Plaintiff Fuller's constitutional rights.

183. As result of Defendant's wrongful acts, Plaintiff Fuller was deprived of his constitutional rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution by being falsely arrested without probable cause, detained in jail, charged and prosecuted for a crime despite being innocent.

184. The criminal case has terminated in Plaintiff's favor.

185. As a direct and foreseeable consequence of these deprivations, Plaintiff Fuller suffered economic loss, physical harm, emotional trauma, loss of liberty, loss of privacy, loss of business and academic rank, and irreparable harm to his reputation.

186. As a further consequence of these deprivations, Plaintiff Fuller was required to retain one the region's most experienced criminal defense attorneys to represent him in the criminal proceedings pursued against him, and incurred significant expenses associated with defending against the unlawful criminal proceedings initiated and sustained by Defendants listed above.

187. Plaintiff has not presented this claim in the state courts: i.e., the collateral estoppel doctrine does

## CAUSE OF ACTION #2:
## RETALIATION AGAINST FREE SPEECH
## IN VIOLATION OF 42 U.S. CODE § 1983
## (PUNISHING "HATE SPEECH")

*Against Defendants Bowen, Phoenix, Barbee, Ellis, McCracken, Neiman, Seltz-Campbell, Woodall, Massengale, Hardee, Courlang, Skurky, Lewis, Parker, Lambeth, Merrit, Chew, Zerden, and Woodall in their individual capacity*

188.    Plaintiffs incorporate all other prior paragraphs in this complaint.

189.    Defendants are "persons," as that term is used in the text of 42 U.S. Code § 1983 and are sued as individuals.

190.    Defendants conspired to develop a criminal investigation that was, in reality, intended to conceal and obfuscate evidence of retaliation against Plaintiff's ridicule of LGBTQ theories.

191.    On information and belief, the circumstances giving rise to this claim against Defendants were not insulated via an intermediary's independent approval, such as a prosecutor or judicial officer that would be expected to be neutral and disinterested. For example, the UNC-CH head counsel, Mr. Parker, is a man married to a man (i.e., an "LGBTQ activist") and he helped set up the LGBTQ Center itself: a conflict of interest to then adjudicate a dispute about its use of funds in the guise of a "neutral party."

192.    Under color of state law, Defendants listed above, acting individually and in concert, initiated and continued an investigation that resulted the Anti-Tranny server being shutdown and its IT staff harassed and threatened. Defendants listed above took actions that were malicious and evidenced a reckless and callous disregard for, and deliberate indifference to, Plaintiffs constitutional rights.

193.    As result of Defendant's wrongful acts, Plaintiffs were deprived of his constitutional rights under the First and Fourteenth Amendments to the United States Constitution by being targeted by the content of their political and religious views for punishment by government action.

194.    The criminal case has terminated in Plaintiff's favor.

195.    As a direct and foreseeable consequence of these deprivations, Plaintiffs suffered economic loss, physical harm, emotional trauma, loss of liberty, loss of privacy, loss

of business and academic rank, and irreparable harm to reputation.

196. As a further consequence of these deprivations, Plaintiff Fuller was required to retain one the region's most experienced criminal defense attorneys to represent him in the criminal proceedings pursued against him, and incurred significant expenses associated with defending against the unlawful criminal proceedings initiated and sustained by Defendants listed above.

197. Plaintiff has not presented this claim in the state courts: i.e., the collateral estoppel doctrine does

198. Plaintiff has not presented this claim in the state courts: i.e., the collateral estoppel doctrine does

### CAUSE OF ACTION #3:
### CONCEALMENT OF EXCULPATORY EVIDENCE AND FALSE SEARCH IN VIOLATION OF 42 U.S. CODE § 1983
### (R$_x$ Was in Open View)
*Against Defendants Mills, Spivey, Gore, Dixon, and Does #1-5*
*in their individual capacities*

199. Plaintiffs incorporate all paragraphs above.

200. Defendants Mills, Spivey, Gore, Dixon, and John Does #1-5 (deputies that could not be identified prior to this action) are "persons," as that term is used in the text of 42 U.S. Code § 1983.

201. Under color of state law, Defendants Mills, Spivey, Gore, Dixon, and John Does #1-5, acting individually and in concert, concealed evidence of Plaintiff's actual innocence gathered at the scene that if promptly revealed would have terminated any suspicion of illegal activity at the scene of Mr. Fuller's warrantless arrest for narctics possession.

202. Defendants Mills, Spivey, Gore, Dixon, and John Does #1-2 conspired to develop a "limited reporting protocol" that was, in reality, intended to conceal and obfuscate evidence of Plaintiff's innocence and to cover-up Defendants' illegal search of the

Plaintiff's vehicle after no evidence of contraband was discovered.

203. In other words, if Defendants' stated truthfully in the case report, "We searched Mr. Fuller's vehicle and found no contraband whatsoever but did see a receipt from Walgreen's in open view in the passenger's seat area for a prescription medication, Methylphenidate ($C_{14}H_{19}NO_2$) prescribed to Mr. Fuller for the treatment of a neurobiological brain disorder," perhaps the probable cause for Mr. Fuller's warrantless arrest for narcotics possession would have been diminished.

204. Defendants Mills, Spivey, Gore, Dixon, and John Does #1-2 knowingly and intentionally concealed critical exculpatory evidence from the scene that (if accurate and truthful as to the circumstances) would have supported Plaintiff's statement that he was lawfully prescribed the medication. Defendants were required to make an accurate police reports, case notes, and other such records and to be truthful in sworn affidavits pursuant to standing court orders, the Fourth, the Fifth, and Fourteenth Amendments to the United States Constitution, and North Carolina law.

205. These Defendants' decision to omit reference this critical exculpatory evidence and to withhold the release of the arrest videos that documented this critical exculpatory evidence was calculated to perpetuate their concealment of all such evidence that did not support their stereotype "hUniversity of North Carolinah" that Mr. Fuller fit the profile of a "Meth Head" who abuses Methamphetamine ($C_{10}H_{15}N$).

206. In addition, Defendants Mills, Spivey, Gore, Dixon, and John Does #1-2, intentionally withheld notes and memorialization of Mr. Fuller's prescription being in plain view in the searched vehicle as required due to the exculpatory nature of this information understanding court orders, North Carolina law, and the Fourteenth Amendment.

207. Defendants Mills, Spivey, Gore, Dixon, and John Does #1-2 actions were malicious and evidenced a reckless and callous disregard for, and deliberate

indifference to, Plaintiff's constitutional rights.

208.    As result of Defendant's wrongful acts, Plaintiff's was deprived of his
constitutional rights under the Fourth, Fifth, and Fourteenth Amendments to the
United States Constitution by being falsely arrested without probable cause, charged
and prosecuted for a crime despite being innocent.

209.    As a direct and foreseeable consequence of these deprivations, Plaintiff suffered
economic loss, physical harm, emotional trauma, loss of liberty, loss of privacy, loss
of business, and irreparable harm to his reputation.

210.    As a further consequence of these deprivations, Plaintiff was required to retain
one the region's most experienced criminal defense attorneys, Thomas Cowart
Goolsby, Esq., (a former state senator and current member of the University of
North Carolina Board of Governors) to represent him in the criminal proceedings
pursued against him, and incurred significant expenses associated with defending
against the unlawful criminal proceedings initiated and sustained by Defendants
Mills, Spivey, Gore, Dixon, and John Does #1-5.

211.    The circumstances giving rise to this claim against Defendants listed above were
not insulated via an intermediary's independent approval, such as a prosecutor or
judicial officer that would be expected to be neutral and disinterested.

212.    Under color of state law, Defendants listed above , acting individually and
in concert, initiated and continued a warrant-less search of Plaintiff's person on
the morning of February 2, 2017, that included one of the Defendants repeatedly
making prolonged physical contact between Defendants' fingers and the Plaintiff's
genitals (i.e., his penis, scrotum, and buttocks) through layered fabrics in open view
of Plaintiff's business clients.

213.    Under color of state law, Defendants listed above , acting individually and
in concert, initiated and continued a warrant-less search of Plaintiff's genital
area pursuant upon their own initiative that exceeded the scope of a search of an

arrestee's person incidental to a lawful arrest based upon warrants issued by UNC-CH the previous day when considering the totality of circumstances.

214.  The Fourth Amendment of the United States Constitution made applicable to the states by the Fourteenth Amendment protects individuals from unreasonable warrant-less searches by local law enforcement officers, and this federal protection was "clearly established" at the time of the conduct in question.

215.  The actions of Defendants listed in above on February 2, 2017, evidenced a reckless and callous disregard for the Plaintiff's federally protected constitutional rights.

216.  Warrant-less searches incident to the process of arrest must be limited in scope to that which is justified under law: i.e., to remove any weapons that the arrestee might seek to use in order to resist arrest or effect his escape. Plaintiff does not fault the arresting officers for conducting an incidental search to his arrest based upon the warrants issued from the University of North Carolina at Chapel Hill's Police Department, but rather there was no probable cause to support the second and more sexually invasive search of Plaintiff's genital area.

217.  Defendants listed above did not attempt a less invasive means to achieve their goal: e.g., issuing a verbal order that instructed Mr. Fuller to empty out his pockets or causing the search of his genitals to occur outside the gaze of Mr. Fuller's clients.

218.  Defendants listed in above were not threatened by the minute amount of medication that was seized in Mr. Fuller's pocket nor did its presence suggest probable cause of an ongoing crime as about 70% of Americans take prescription medications[8].

219.  The criminal charge for narcotics possession and the subsequent prosecution terminated in favor of the Plaintiff on March 6, 2017 by court action.

220.  As result of the wrongful act of Defendants listed in above , Plaintiff was seized

---

8       See https://newsnetwork.mayoclinic.org/discussion/nearly-7-in-10-americans-take-prescription-drugs-mayo-clinic-olm-sted-medical-center-find/

and searched in a sexually invasive manner depriving him of his federally protected constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution: i.e., to be avoid being forced to submit to a sexually invasive fingering of one's genitals while in physical restraints with onlookers gawking.

221. As a direct and foreseeable consequence of this invasive search, Plaintiff suffered emotional trauma, loss of liberty, loss of privacy, and humiliation and irreparable harm to his reputation due to the onlookers watching in close proximity.

222. The officer conducting the search did so while Mr. Fuller was handcuffed and ordered to look away by the other Defendants. Thus the search of Mr. Fuller's pockets was done from behind in what is known in gay slang as a "reach around" -- Defendants' fingers were first inserted into Plaintiff's rear pockets (making contact with Plaintiff's buttocks) and then reaching around to go deep into his front pockets (making direct and prolonged contact with Plaintiff's genitals): a position that requires the person conducting the search draw very close to .

223. The State must take care not to conduct warrant-less searches of men that require them to assume such a sexually submissive posture.

224. Defendants conduct of making direct and repeated contact with Plaintiff's genitals in the "reach around posture" amounted to the intentional infliction of "severe emotional distress" because (i) Defendants' conduct was known to be an atrocious affront to one's dignity and utterly intolerable; (ii) had a high degree of probability that the emotional distress will follow' and did in fact result in (iii) the defendants' conduct caused such severe emotional distress to the Plaintiff that it triggered an episode of "emotional dysregulation" releasing more adrenaline into his bloodstream causing panic and fear and anxiety that culminated in the onset of a severe migraine headache that lasted about 24 hours: i.e., intense pain, vomiting, extreme sensitivity to light and sound, and visual auras. Plaintiff's symptoms was so severe that it required him to miss work the following day. That Plaintiff's

experience of this unwanted sexual contact rose far above a "highly unpleasant" experience and manifest to this day in Plaintiff's deep fears that any routine encounter with law enforcement may suddenly result in Plaintiff being ordered submit to fingering in his genitals in a "reach around" position.

225. Defendants listed are jointly and severally liable to Plaintiff for this violation of his rights, pursuant to 42 U.S. Code § 1983 *et seq*. That said, Plaintiff is not seeking monetary relief.

## CAUSE OF ACTION #4:
## WARRANTLESS SEARCH OF PLAINTIFF'S VEHICLE
## IN VIOLATION OF 42 U.S. Code § 1983
*Against Defendants Mills, Spivey, Gore, Dixon, and Does #1-5*

*in their individual capacities*

## ~~FIFTEENTH CAUSE OF ACTION: VIOLATIONS OF 42 U.S. Code § 1983 (MON~~ELL ~~V. DEP'T OF SOCIAL SERVS., 436 U.S. 658 (1977))~~

226. The Supervisory Defendants (Copley, Huffman, MacMahon, Hart, Wyatt and Courdier) and the County of New Hanover are "persons," as that term is used in the text of 42 U.S. Code § 1983.

227. In *Monell v. New York City Department of Social Services*, 436 U.S. 658, 690 (1978), the Supreme Court held that municipalities qualify as "persons" under the statute, rendering them amenable to suit.

228. As evidenced in the LeBlanc corruption case *inter alia*, the Supervisory Defendants (Copley, Huffman, MacMahon, Hart, Wyatt and Courdier) have history of allowing, condoning, or failing to correct systemic, persistent and widespread corruption within the County's Vice and Narcotics Division of the Sheriff's Office.

229. The failure of the Supervisory Defendants (Copley, Huffman, MacMahon, Hart, Wyatt and Courdier), to address such corruption has allowed such corruption to continue with deliberate indifference.

**CAUSE OF ACTION #5:**
**CONSTITUTIONAL CHALLENGE TO STATE STATUTE**
**IN VIOLATION OF 42 U.S. Code § 1983**

*Against Defendants State of North Carolina and Joshua Stein*

230. The Defendants above are "persons," as that term is used in the text of 42 U.S. Code § 1983.

231. The charging statute, N.C. Gen Stat. § 14-196.3 (b)(3) makes it a crime "to annoy or to embararss" via email and is therefore and unjust and over-broad restriction on free speech that is selectively enforced to chill the exercise of free speech.

**CAUSE OF ACTION #6:**
**CONSTITUTIONAL CHALLENGE TO STATE STATUTE**
**IN VIOLATION OF 42 U.S. Code § 1983**

*Against Defendants State of North Carolina and Joshua Stein*

232. The Defendants above are "persons," as that term is used in the text of 42 U.S. Code § 1983.

233. The state statute, N.C. Gen Stat. Chapter 168A, Persons With Disabilities Protection Act, § 168A-11(c) interferes with the ability to make USDOJ complaints without loosing the ability for recourse in state courts and is therefore and unjust and over-broad restriction on federal law that is prohibited via the doctrine of federalism, and in addition, 5th and 14th Amendments due process.

**CAUSE OF ACTION #7**
**FERPA**
**IN VIOLATION OF 42 U.S. Code § 1983**

*Against Defendant MIT*

234. The Defendant above is a "person," that can be sued.

235. The Family Educational Rights and Privacy Act (FERPA) (20 U.S.C. § 1232g; 34 CFR Part 99) is a Federal law that protects the privacy of student records.

236. MIT released private donor profiling to UNC Police upon request per the "harassment" investigation. These materials included financial records of Mr. Fuller and had nothing to do with Mr. Fuller's police record at MIT -- there was no record and MIT should not have assisted UNC Police by releasing confidential student records.

Claim of Action # 8
  against Defendant Zorden in her
  professional capacity.
42 USC 1983 - Viewpoint Discrimination
  in violation of 1st Amendment

237. Zorden contacted the Anti-Tranny
server for email on her official
UNC government - a company based in
Atlanta, GA.

238. Using her official role as a government
agent, Zorden, a dean at UNC-CH, demanded
the company providing server space to,
Anti-Tranny, cease doing so the act was in
u hate mail. Such an act was a state employee by
the scope of her role as a Anti-Tranny by
and intended to silence Anti-Tranny in violation
denying it access to the Internet in express
  of Anti-Tranny's ability to express

Claim of Action #9
Re-filing of APA claims in earlier federal case, 7:18-cv-000059-FL E.D.NC.

Claim of Action #10
Re-filing of Section 504 claims in earlier federal case

240. On or about 5 April 2018 Mr. Fuller filed a federal action against 6 state employees alleging violations of APA Title II and Section 504

241. The claims were transferred back to the State but it failed to adjudicate them despite Plaintiff's good faith efforts.

242. The claims are expanded to include Defts. State of NC and Sheriff Blackwood and Orange and New Hanover Counties and all associated deputies of both Sheriff's departments + police, prosecutors, UNC lawyers + investigators and bailiffs.

Claim #11 the above two sets of claims are also brought via Section 42 USC 1983 via due process,

237. **WHEREFORE, Plaintiffs respectfully requests that this Court: ( a) RULE that the actions of Defendant violated Plaintiff's rights under the United States Constitution and other laws; (b) ENTER JUDGMENT awarding Plaintiff declaratory and injunctive relief as the court sees fit and proper; (c) AWARD Plaintiff costs and reasonable attorneys' fees in this action; and (d) GRANT Plaintiff any other such other and further relief as this Court may deem just.**

238. Respectfully submitted, this 18th day of February 2020. Petitioner, is a self-represented party and this pleading should be construed liberally and not to the high standards of an appellant attorney. Courts have traditionally afforded leeway to compensate for a self-represented party's lack of legal training: i.e., *pro se* pleadings must be construed liberally. See *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) and *Haines v. Kerner*, 404 U.S. 519, 520-21. Under federal disability laws, Mr. Fuller is considered to a "qualified person with a disability" and is thus protected from unjust discrimination when participating in state courts on account of that disability. See *Tennessee v. Lane*, 541 U.S. 509 (2004).

NAPIER S. FULLER
*in propria persona*
2201 Lynnwood Drive
Wilmington NC 28403
*provocare@protonmail.ch*

Feb 18, 2020

ATTACHMENTS to BE FORTHCOMING IN

SEPARATE FILLING